F. L. WILLIAMSON, APPELLANT, v. A. L. FRANK, RESPONDENT.*

Kansas City Court of Appeals. January 23, 1928.

644

*Corpus Juris-Cyc References: Appeal and Error, 4CJ, section 2867, p. 897, n. 81; Partnership, 30Cyc, p. 444, n. 19; p. 737, n. 73; Witnesses, 40Cyc, p. 2744, n. 60.

*McCune, Caldwell & Downing* for appellant.

*Ryland, Boys, Stinson, Mag & Thomson* for respondent.

BLAND, J.—Plaintiff and defendant were partners doing business in Kansas City, Missouri, under the name of Transportation Engineering and Sales Company (hereinafter called the partnership), each of the parties owning a one-half interest therein. The partnership was dissolved on December 31, 1923, and this is a suit for an accounting between them. During the existence of the partnership plaintiff was vice-president and sales manager of the Dewey Portland Cement Company (hereinafter called the cement company) and defendant worked under him as assistant sales manager for that concern. Defendant had been in the employ of the cement company since 1914 and at the time of the trial, which was had on September 13, 1926, was thirty-four years of age. The partnership dealt in the sale of automobile trailers and electric trucks and was originally formed between one Eyer and plaintiff. About the first of January, 1920, Eyer ceased to be a member of the firm and defendant and one Guignon came into the partnership, each acquiring a one-fourth interest therein, plaintiff having a one-half interest.

There was evidence tending to show that plaintiff had a number of private business interests to which he was giving attention aside from the duties he performed for the cement company, and defendant testified that plaintiff was in the habit of having the witness attend to various matters connected with plaintiff's other business aside

from that of the cement company; that in this connection he was directed by plaintiff to work at these matters during business hours and sometimes the witness's work involved trips out of the city on behalf of plaintiff in connection with plaintiff's other affairs. We gather from defendant's testimony that he obeyed plaintiff without question in all matters, even including the investment of the private funds of the former.

Defendant testified that he purchased his interest in the partnership directly from plaintiff, plaintiff having informed him that "he had taken over Mr. Eyer's interest in the company;" that "Mr. Guignon was taking a one-fourth of it and he wanted me to take the other one-fourth and I agreed to do as I did to anything that he suggested." Defendant acquired the one-fourth interest for $1125 but he testified that there was no agreement as to how this money should be paid. He further testified that Guignon also paid $1125 for the latter's one-fourth interest.

The main contention in the case is over the question of the salary defendant was to draw from plaintiff growing out of the following circumstances: It appears that in the month of March, 1920, defendant had received an offer from one Ward Neff for employment by the latter in Chicago. Defendant testified that in the middle of March, 1920, he had under consideration this offer which, if accepted, would result in—

". . . a material increase in my income, and I told Mr. Williamson (plaintiff) that I expected to leave. He took the position that he could not afford to lose me, and offered to pay me $100 a month extra if I would stay with him for such time as I would stay with him, I was getting $250 a month at the time, and I outlined to him that that extra hundred would not be attractive, that my offer was greater than the sum of the two compensations from him and the Dewey Portland Cement Company. He then pointed out that I was not at the limit of my earning capacity with the Dewey Portland Cement Company, that I should be willing to gamble a little on the future, and that while I would be getting a smaller income from these two incomes than I would from my other offer, that for a period of time it would probably show me a profit, and I agreed to accept his proposition. He then brought up the matter of the indebtedness on the transportation account, he said that he thought it would be fair to apply that $100 to what I owed him on the Transportation Engineering and Sales Company. I told him that I thought that was fair, that I would be willing to do that until such time as my interest was paid out or my indebtedness to the Transportation Company, after which I would be paid in cash. So I continued with him."

That it was agreed that "As long as I stayed with him, in consideration of not leaving and staying with him, I would get $100 a

month as long as I stayed with him." Defendant further testified that at that time nothing was said by either of the parties in reference to payment of the $100 a month ceasing when his income or salary directly from the cement company should be increased but that a prospective increase in his salary by the cement company was talked of at that time but not "definite amounts;" that this prospective increase was offered to him as an inducement for him to stay with plaintiff "in addition to the $100 a month." As will hereinafter be pointed out, plaintiff testified that the $100 a month to be paid defendant was to cease when defendant's salary was increased $100 a month by the cement company and that this increase occurred four months after the agreement.

Defendant testified, on cross-examination, that at the time of his agreement with plaintiff in March, 1920, he was receiving $245 or $250 a month from the cement company and that plaintiff did not tell him that he would try to get the former's salary increased; that plaintiff first told him that he would pay him $100 a month in cash "if you stay with me, as long as you stay with me." I agreed to it, and the next breath he said, "I think it will be fair, substantially, I think it will be fair for you to apply those matters to the indebtedness for the Transportation Engineering and Sales Company." I said, "that is fair, I will do that." "Q. That is what you say the arrangement was? A. Yes, that is what the arrangement was." It will be borne in mind in this connection that at this time defendant had not paid any part of the $1125 to plaintiff for defendant's interest in the partnership and, in fact, he never at any time paid any money in cash on this indebtedness.

Defendant testified that there was nothing said about any record being made or account kept in the books of the partnership of the $100 a month that was to be paid by plaintiff to him, but that during the summer of 1920, presumably about June 30th of that year, plaintiff told him to keep a record of the $100 a month salary on the books of the partnership; that at that time the books were being kept by a regular bookkeeper employed for that purpose, who continued to keep the books until the fall of 1920 when the bookkeeper was discharged and defendant thereafter had charge of the books; that the $100 per month salary was a personal account between himself and plaintiff; that he was not an accountant and that he made these entries in the book regarding the monthly salary of $100 because he was directed to do so by plaintiff. Defendant's deposition was then called to his attention in which he stated, "The arrangement was I was to draw a compensation of $100 per month to be credited on the books of the Transportation Engineering and Sales Company as a condition of our partnership to be credited against my interest in

that business.'' He admitted at the trial that he gave this testimony and explained it when asked if that was the arrangement by saying, ''That was the completed arrangement, yes, sir, I testified that and that is still true.'' He further testified at the trial— .

''Q. Now, when you made that arrangement what was said as to what was 'to become of this $1125 that you owed Williamson? A. When I made that arrangement, this completed arrangement— nothing was said about it, the hundred was to apply against any indebtedness.

''Q. Now, how long do you say now that that arrangement was to continue? A. Until as long as I was with Mr. Williamson.

''Q. As long as you were with Mr. Williamson? A. Yes, sir, when my indebtedness was paid out, I did not put up any cash.

''Q. You say that was the understanding? A. Yes.

''Q. I will ask you if when you gave your deposition you were asked this question:

'' 'Q. For how long a time was that to continue?' (That is, this arrangement.) A. As long as the partnership continued the conduct of the partnership.

''Q. Now, was it that, or was it as long as you stayed with Mr. Williamson? A. Well, that is substantially the same.

''Q. No, I am asking you which was it, was it as long as you stayed with Williamson or as long as this partnership continued to exist, which was it? A. Well, the original arrangement was that I was to get $100 a month as long as I stayed with him, if I would stay I would get it as long as I stayed with him, the partnership angle came into it later. . . .

''Q. Now, at the time you say now the arrangement was that you were to get this $100 a month, that is it was to be applied against your $1125 until it was paid, then you would get it in cash? A. It was to be applied against any indebtedness due that Transportation Engineering and Sales Company and then paid in cash.

''Q. You didn't have any indebtedness except this $1125 at that time, did you? A. That is what it was at that time.''

Defendant never advanced any cash on account of the partnership, either to pay for his original investment or money for the operation of the business. However, plaintiff advanced considerable sums of money, about $14,000 in all, for the operation of the business and at the time the partnership was dissolved it was still owing plaintiff the sum of $2748.63 on account of these advancements.

Defendant testified that he purchased Guignon's one-fourth interest from plaintiff in the latter part of 1920, Guignon having previously sold it to plaintiff. Immediately after defendant gave the testimony which we have just quoted, the court got into a controversy

with the attorney for plaintiff in which the court expressed the opinion that defendant would not only be obligated to plaintiff for his interest in the business but "he would be obligated for the capital or money that the concern had borrowed, he would be obligated for his half of it . . . I say this $100 was to go on, if it were to go on, just the same, to pay for the half of the moneys that had been advanced. . . . It did not stop when he paid for his interest in the business." Thereupon upon further cross-examination of the defendant, he testified that the agreement was that after his "part of the indebtedness" was paid he was "to have this $100 a month in cash" but that he had never drawn any cash from the partnership and had never made any contention to plaintiff that he was entitled to this $100 a month in cash because "the company was always in the hole."

Defendant testified that about August, 1920, plaintiff informed him that the latter "had taken over Mr. Guignon's interest and that he wanted me to assume it;" that the witness agreed to do so but that there was nothing in writing or anything said about what or how he was to pay for Guignon's interest or about the termination of the payment of the $100 a month to the witness by plaintiff; that the witness assumed that he was to pay plaintiff $1125 for the one-fourth interest the latter had purchased from Guignon and that the witness was to pay it at the rate of $100 a month; in other words, plaintiff after the first $1125 had been paid was to continue to retain the $100 a month that he had agreed to pay defendant and apply it upon the purchase by the defendant of the interest that Guignon had had in the partnership. He was then asked: "You say now that after this total debt, including your $1125, and Guignon's $1125, was paid out by the application of this $100 a month, that you were to get the cash? A. That is right." The court then took the witness and the following occurred:

"Q. Let me understand, you were to get the cash then, or pay the balance of the money that had been advanced that they still owed? A. Whenever my obligation to Mr. Williamson was canceled at the rate of $100 a month, he was to pay me in cash.

"Q. That means your obligation not only for what you were to pay for the interest in the business but what the company owed? A. Yes.

"Q. It was not to stop? A. I was to get $100.

"By MR. CALDWELL:

"Q. Whenever your obligations were completed, satisfied? A. Yes, sir, I was to get $100 a month.

"Q. When was that agreement made that you were to get this money in cash? A. About March 15, 1920.

"Q. That is, it began April? A. Yes, sir.

"Q. When your deposition was taken I asked you this question (page 11):

" 'Q. When were you ever to get any cash out of this $100 a month? A. There was no understanding when I would get it.

" 'Q. The only discussion you had was to the effect it would come by way of a credit on the books of this company? A. That is right.

" 'Q. Is that all that was said about that subject? A. That is substantially what was said, which was what you asked me for, substantially what was said, there was nothing more said.'

"Q. Is that right? A. I don't know whether the deposition says that I was to get cash after my obligation was through, if I said that, that is an error in that particular.

"Q. In any event the understanding when you took over Guignon's interest was that you expected that you were to pay Williamson that $1125, didn't you? A. I understood I was to pay at the rate of $100 a month.''

At the conclusion of the witness's testimony the following from his deposition was offered in evidence by plaintiff but upon objection of defendant it was excluded, " 'Q. What was your impression whether it would cost you anything, or whether it was a gift to you? A. My impression was that I was to draw $100 a month *from this partnership* during the life of the partnership.'' (Italics ours.)

After defendant took over the keeping of the books in the fall of 1920, it appears that the business in the partnership was such that the items to be entered in the books were not extensive. He testified that he did not make the entries in the books as the transactions occurred but would make them at periods of sixty days apart and that it would require about two hours each time for him to post the books. He testified that plaintiff at all times had access to the books and that they were kept under plaintiff's direction. The first entry that appears in the books regarding the salary of $100 per month was one made about June 30, 1920, but was dated March 31. The account appearing in the books covering the $100 a month transaction reads as follows:

"1920 A. L. Frank March 31, F. L. Williamson, allowance on business interest at $100 per month $100 June 30, 3 Mo. $300 Dec. 31, 6 Mo. $600 21 Aug. 7, 7 Mo. $700, (total) 1700 Dec. 31, 21, 4,400 22 Jan. 1922 100 Feb. 1922 100 Mar. 1922 100 Apr. Aug. inc. 500 Sept. Nov. inc. 300 Dec. 100 (total) 3300 23 Jan. 23 100 Feb. May, 23 400 June, Aug. " (23) 300 Sept." (23) 100 Oct. Dec. " (23) 300 (Total) 4500.''

Defendant further testified that in the month of August, 1921, he asked plaintiff to pay him what was owing the witness but plaintiff requested defendant to pay the former what defendant owed him;

that defendant said to plaintiff that the latter "owed me this $100 a month" and plaintiff said "Let's see you get it" but defendant did not take this as a denial by plaintiff that he owed it but merely went to defendant's ability to get it; that nothing "worked out in that discussion." Shortly thereafter and on August 19, 1921, defendant made a written offer to plaintiff to settle. This proposition recites that the sum of $1700, the amount of the monthly payments of $100 that had accrued at that time, should be considered as having been invested in the partnership business by the defendant and that the amount of money standing to the credit of plaintiff on the partnership book, to-wit, $11.073.63 "plus any advances subsequently made" should represent plaintiff's investment in the business. Plaintiff refused this offer. Defendant further testified that the partnership never made any money at any time from the moment it started; that he did not show the earning of the $100 per month in question in his income tax report or in the income tax report of the partnership.

Plaintiff testified that when he and Eyer organized the business that each put in $1750, which was not preserved as capital but was used in the business; that they had employed Mr. Guignon who was in active charge of the business; that in the latter part of January, 1920, Guignon wanted to acquire Eyer's interest and that Guignon interested defendant "in the proposition;" that as the result of the negotiations between Guignon and Eyer an agreement was made between Eyer, Guignon and defendant to the effect that Eyer's interest was worth the sum of $2250 and that Guignon and defendant should purchase the same from Eyer at that sum. Plaintiff further testified that Eyer was indebted to plaintiff in a sum larger than $2250 and that he credited Eyer's indebtedness to him in the sum of $2250 and took defendant's and Guignon's "obligation" to the witness "for that $2250;" that at the time this arrangement was made a written contract was entered into, which was introduced in evidence. This contract was dated January 1, 1920, and recites that Guignon and defendant each paid plaintiff the sum of $1125 and that plaintiff transferred to each of them an interest in the business of the partnership of twenty-five per cent; that plaintiff should be manager of the business "and direct all the transactions of the business" and that Guignon should be sales manager. The contract did not recite that defendant should have any duties but the evidence shows that he did perform some services for the partnership consisting of attending meetings of the partnership and consulting on matter of business policy, in making one trip to St. Louis, in helping make out income tax reports, in keeping the books of the concern after October or November, 1920, and defendant testified, "I tried to do some selling" after March, 1920.

Plaintiff further testified that neither Guignon nor defendant paid him any part of the amount that they agreed to pay for their interest in the business; that in March, 1920, the defendant was offered a better salary by Ward Neff than the cement company was paying him; that defendant was then receiving a salary of $250 per month from the cement company, and the witness had been attempting to get him a better salary and was making an effort to get it raised to $350 a month; that "I agreed to make up the deficit of $100 a month until he got his salary to the point he was wanting," to-wit, $350 per month; that on July 1, 1920, defendant's salary from the cement company was increased to $350 a month and that the $100 a month payment from plaintiff to defendant automatically stopped at that time under their agreement.

Plaintiff further testified that his agreement to pay $100 a month to defendant was purely a "voluntary contribution on my part for which he (defendant) was agreeing to render no special services;" that—". . . at that time I was trying to get this salary increase for him because I felt he was in the right, I felt he was entitled to that salary increase from the company. I tried to get Mr. Tyler, under our by-laws he had the fixing of the salary, while he worked under me, I could not fix his salary;" that defendant never rendered any different services after the agreement than before; that it was understood that the monthly payments to defendant should apply on what the latter owed the former; that there was no discussion between them as to defendant's having a credit of $100 a month on the books of the partnership. Plaintiff denied that he instructed defendant to make any entries in the partnership books in reference to the $100 per month salary. He testified that he credited defendant with $100 for the first month upon the witness's personal books but did not give him any further credit thereon because the witness had "neglected" to do so; that the agreement was a purely personal one; that the witness never paid defendant any part of the $100 a month for the reason that under the arrangement he had with defendant the $100 a month was to be credited upon the $1125 that defendant owed him on account of the latter's purchase of an interest in the partnership; that the bookkeeper for the partnership did not leave until October or November, 1920, and that defendant had nothing to do with the books until that time; that neither he nor defendant was drawing any salary from the business; that the business was being handled by Guignon who devoted all of his time to it and that the three of them would have a conference occasionally at the office; that the partnership business was a side issue as far as he and defendant were concerned.

Plaintiff further testified that in August or September, 1921, Guignon's interest was acquired by defendant; that Guignon wanted

to sell his interest to plaintiff but the latter refused to buy it; that the witness did not want Guignon to leave the partnership as the latter was making a success of it; that defendant was willing to have Guignon go and the witness discussed the matter with defendant; that defendant acquired Guignon's interest and agreed to assume the "obligation" of Mr. Guignon to plaintiff to pay the latter $1125 for his (Guignon's) interest in the partnership; that "I released Mr. Guignon of his obligation to me of $1125 as Mr. Frank obligated himself to me for a like amount;" that defendant agreed to pay the same price for Guignon's interest that Guignon had paid originally for it; that these two $1125 items were never charged upon the books of the partnership; that after Guignon left, he and the defendant each owned a one-half interest in the business; that there was no agreement or discussion about defendant's being entitled to any credit by the way of a salary from the partnership; that neither defendant nor Guignon at any time ever advanced any money to the partnership; that after Guignon left there was "no sales activity" in Kansas City but that the partnership had a few salesmen in St. Louis who handled "sales activity there."

Plaintiff further testified that he saw the books of the partnership at various intervals but he at no time saw, until after the dissolution of the partnership, any entry in the books "in reference to this $100 a month that Frank was claiming;" that these entries were not in the books up to the time the partnership was dissolved.

On cross-examination plaintiff admitted that he had testified in his deposition that the reason he agreed to pay defendant $100 a month out of his own pocket was that there had recently been a "horizontal cut" in the salaries of the officers and employees of the cement company and that he thought defendant was entitled to more money and he was willing to pay him $100 a month until defendant's salary was restored. He testified at the trial that the testimony given in his deposition was incorrect and explained, or at least attempted to explain, his mistake by saying that four or five years had transpired between the time of the agreement concerning the $100 a month payment and the time the deposition was taken; that before his deposition was taken he did not expect to be asked about that matter in the deposition but after the deposition was taken he examined his personal memorandum and found that the transaction was as he testified at the trial; that as a matter of fact there had been a horizontal cut in salaries but that this occurred in August, 1921, or after the agreement had between the parties in March, 1920. At the trial he further testified that there was nothing said when defendant purchased Guignon's interest as to how defendant was going to pay for it and as a matter of fact nothing was said at the time

defendant first entered the partnership as to how he was to pay for the interest he then acquired.

Plaintiff further testified that he was interested in other business matters than the cement company's business during the time the partnership was in existence but that he was not active in any other business than the cement company's although he was interested in two or three others; that he did not recall that defendant gave him any assistance in any business other than the cement and partnership businesses and that defendant himself was interested in the partnership business; that defendant did not work for or assist plaintiff in any other business. He further testified that in 1921 when defendant wanted him to pay him the $100 a month in cash he demanded of the defendant that he pay him for his interest in the partnership business, and at that time he told defendant "I was not paying him $100 a month, the $100 a month stopped a long time before that, stopped when his salary was increased." He further testified that when defendant sought to settle with him on August 19, 1921, he said to defendant, ". . . that he did not have $1700 coming, that that $100 a month stopped when his salary was increased" and that the witness declined the proposition of settlement.

The witness, Eyer, testifying for the defendant, stated that he sold his interest in the partnership to plaintiff and not to the defendant or Guignon; that he did not remember of having any dealings with defendant or Guignon in reference to the sale of his interest in the partnership.

The witness, Tyler, testifying for defendant, stated that during the time in controversy he was president of the cement company; that plaintiff had various other interests when the latter was working for the cement company and that the witness protested to plaintiff on a number of occasions about "hiring people in the office to work in connection with other lines of business," especially in reference to his "hiring Mr. Frank in our office, considering his connection with the Dewey Portland Cement Company to work for him in his outside activities;" that he protested about plaintiff's having defendant to do work for the partnership but that plaintiff, nevertheless, continued to do these things; that finally the witness, in January, 1924, discharged plaintiff on account of his persistence in these matters. There is other testimony tending to show that defendant continued in the employment of the cement company and was appointed to plaintiff's position with it shortly after the latter was discharged. Tyler further testified that a month or two after plaintiff was discharged by the cement company, the witness was in the office of the partnership where he talked with plaintiff and that the latter protested "very strenuously against Mr. Frank's action of entering up in some books that he pointed to there on the desk, of entering up salaries he claimed that

Mr. Frank should not have entered up, inasmuch as the arrangement that he had with Mr. Frank, he said, had stopped some fourteen months before that time, or fourteen months before some date that I just haven't got fixed." "Q. Well, was any protest made by Mr. Williamson with respect to the charges of salaries by Mr. Frank prior to the fourteen months period? A. Not that I know of."

On cross-examination he testified that plaintiff told him at the time in question that defendant "made 14 entries in the book of $100 a month and he said that Mr. Frank had made them after he knew that the deal was off and therefore that he was trying to rob him out of $1400;" that plaintiff—

". . . pointed to some place in the book that I did not stop to look at or anything about it, other than he just pointed at it and said that Mr. Frank made these entries and he should not have made them.

"Q. Made fourteen entries? A. Yes, sir.

"Q. How do you remember it was fourteen? A. Well, it is rather an unusual proceeding, I think, to be called in, that is when you are talked to in the way Mr. Williamson talked to me, and the further fact that Mr. Williamson's supreme effort was to impress me, and I guess he did.

"Q. That was two and a half years ago, and you want to tell the court that you remember that he said to you then there were fourteen entries that Frank should not have made in this book? A. Mr. Williamson, yes.

"MR. THOMPSON: Just a moment, that is objected to as the witness has testified there were entries covering fourteen months.

"THE COURT: No, he said fourteen entries.

"A. Fourteen entries, $1400, $100 entries, he pointed to some place where Mr. Williamson crossed the pencil and said at that time he thought Frank had put in $1400 and, as I say, I want to repeat in answer to your question, that it was Mr. Williamson's idea to impress me."

The witness said that there had been considerable friction between himself and plaintiff regarding the matters about which the witness protested to plaintiff, and that his feeling against plaintiff was strong on account of it.

On December 15, 1926, after the case was closed and taken under advisement, plaintiff filed a motion to reopen the case so that he might introduce the testimony of one Danielson. It was alleged in the motion that after the trial of the case plaintiff and his attorney first learned that Danielson, who was defendant's uncle, would state, among other things, that sometime in the year 1920 defendant was endeavoring through plaintiff "to get his salary with the cement company increased; that defendant said to him that he had not been able to do so, but that plaintiff had personally agreed to give defendant $100 per month until such time as his salary with the cement

company· "was increased; that within a few months thereafter . . . the defendant told him his salary had been increased and that the $100 per month to be paid him by plaintiff had stopped." The court refused to open the case and rendered judgment in favor of plaintiff in the sum of $457.76. In arriving at this judgment the court allowed plaintiff the sum of $1374.31, being one-half of the balance due plaintiff for advances that he had made to the partnership, plus $2250, the amount representing the purchase price of a one-half interest in the partnership acquired by defendant from plaintiff. The court also allowed plaintiff one-half of a collection kept by the defendant, which collection amounted to $215.70, together with one-half of the amount received by plaintiff for some furniture of the partnership sold by him which one-half amounted to $174, making a total allowance to plaintiff of $3557.76. The court allowed defendant $3100 for salary, leaving the amount due plaintiff in the sum of the judgment. Plaintiff has appealed.

Plaintiff insists that there is no possible theory upon which the court could allow defendant the sum of $3100 as salary. Defendant says that this allowance can be explained in two ways; that while defendant was claiming the sum of $4500 on account of the item of salary from plaintiff and still insists that he is entitled to that amount, the court may have concluded that plaintiff owed defendant the $100 per month only up to the time of the offer of compromise made by defendant in August, 1921, after which time the obligation to pay $100 per month would rest with the partnership, and on this theory plaintiff would owe defendant $1700 for seventeen months salary and that for the remaining twenty-eight months the partnership would be liable to Frank for salary in the sum of $2800. But Frank having a one-half interest in the partnership, he would be entitled to only $1400 of the amount the partnership owed him, making a total of $3100. The trouble with this calculation is that there is no evidence whatever upon which it can be made. There is evidence that plaintiff was to pay defendant $100 a month as long as the partnership existed and defendant in his deposition testified that the agreement was that the $100 a month was to be paid by the partnership. However, there is no testimony that a part of the $100 a month was to be paid by plaintiff and the balance by the partnership.

The other was suggested by defendant as to how the court came to allow him the sum of $3100 as salary and is very likely the method the court used. This suggestion of defendant is that the court was influenced by the testimony of Tyler who stated that plaintiff said to him that defendant had entered in the partnership books items amounting to $1400 for salary that plaintiff had not agreed to pay; that the court found from this testimony that plaintiff had in effect admitted to Tyler that he owed defendant the balance of the salary shown on the books. This balance was $3100. However, Tyler was

confident that the statement that plaintiff made to him was that defendant had made ''fourteen entries, $1400, $100 entries in the books'' and that plaintiff pointed to a place in the book where the entries were made. The books themselves show that no such entries are contained in them. There are only sixteen entries in all in the book in reference to the $100 a month salary, and the last fourteen entries aggregate $4100. There is nothing disclosed in the testimony upon which a theory or calculation can be based that if plaintiff is entitled to more than $400 as salary, he is entitled to less than $4500. Tyler admitted some feeling against the plaintiff at the trial and it is not at all likely that plaintiff ever made such a statement to him. Plaintiff denied that he made the statement. It may have been that plaintiff did say to Tyler that fourteen of the entries were wrong. It will be noted that if the last fourteen entries in the book are not considered, there is left the two entries covering the $400 that plaintiff admits defendant to be entitled to.

There is considerable dispute in the testimony as to what the contract was between the parties entered into in March, 1920, in reference to the payment of the $100 a month to defendant. Defendant relies upon the well-settled rule that in suits in equity the appellate court may arrive at its own conclusion as to the weight of the testimony but where the testimony is all oral or nearly so, that court will defer to the finding of the chancellor who had the opportunity of viewing the witnesses and judging the weight of their testimony. We would be willing to leave the matter of the weight of the testimony in this case to the chancellor, especially in view of the fact that both plaintiff and defendant made contradictory statements in their depositions to their testimony given at the trial, although the divergence between the testimony contained in the deposition and that given at the trial is certainly more pronounced in defendant's case than plaintiff's. Plaintiff at least attempted to explain the inconsistency between his testimony in his deposition and that given by him at the trial, but defendant never at any time attempted to explain the testimony in his deposition that it was his impression that the $100 a month was to be paid by the ''partnership during the life of the partnership.'' In fact, he even went to the extent of objecting to this testimony and having it excluded although we think it was clearly competent. It is true that he was asked to give his ''impression'' of what the agreement was while it would have been much better had he been asked what his recollection was in reference to the matter. But for the purpose of showing an admission, it was sufficient. If defendant could not recall in his deposition his impression of the matter, he could not have had any recollection about it; at that time his recollection and ''impression'' must have been the same. He testified at the trial as to his recollection; his impression could not have been different than his recollection. There is no showing that he

had any better recollection at the trial than he had when his deposition was taken. In this instance, for the purpose of impeachment, this recollection and impression must be considered the same.

Even this unexplained admission found in the deposition would probably not be ground for a disagreement on our part with the conclusion of the chancellor, who, of course, found that defendant's version of the agreement in question was true, if defendant even at the trial had given testimony of the nature that would permit us to determine what was in fact the actual agreement between the parties. His testimony at the trial is so inconsistent in reference to this matter that it is impossible for us to arrive at the agreement from it. He first testified that the $100 to be paid by plaintiff to him was not to be paid in cash until he paid plaintiff "on the Transportation Engineering and Sales Co." Evidently meaning until defendant paid plaintiff the $1125 that he owed him for his interest in the partnership. He then said he was not to get the cash "until such time as my interest was paid out or until my indebtedness to the Transportation Company after which I was to be paid in cash." He was not indebted to the partnership in any way at the time this agreement was made. He next says that the money was to be first applied "to the indebtedness for the Transportation Engineering and Sales Company," evidently meaning that it was to be applied upon his indebtedness to plaintiff for the interest that he had purchased in the partnership.

He first stated that the $100 a month was to continue as long as he should stay with plaintiff but he admitted that what he stated in his deposition was true, to-wit, that it was to accrue as long as the continuation of the partnership, stating at the trial "that is substantially the same." He was then asked at the trial whether it was one or the other and he answered that the original arrangement was that it was to continue as long as he stayed with plaintiff and "the partnership angle came in later." What he meant by the use of the words we have just quoted is not explained and they are inconsistent with the rest of his testimony. No doubt defendant realized at this point that it would strike the court as extremely improbable that plaintiff, or anyone else, would agree to pay *indefinitely* a salary of this kind, depending on the will of defendant. Such a contract would be of doubtful legality.

Defendant then testified that the $100 a month was to be "applied against any indebtedness due the Transportation Engineering and Sales Company and then paid in cash." He was then asked if the only indebtedness at the time was $1125 and he said that it was, but, obviously, this $1125 was not due the partnership. Defendant later testified that the agreement was that after he "paid his part of the indebtedness" he should receive the $100 a month in cash. This is the first time any indebtedness of the partnership was mentioned. Defendant then stated that he had never made any contention to

plaintiff that he was entitled to $100 a month in cash because the company was always in the hole. Of course, if plaintiff was liable for the payment in cash of $100 a month after the $2250 due plaintiff was discharged by the $100 a month credits, it would make no difference whether the partnership was in the hole or not. Shortly after this testimony, defendant was asked ''You would say now that after this total debt including your $1125 and Guignon's $1125 was paid out by the application of this $100 a month that you were to get the cash? A. That is right.'' This is inconsistent with the idea that he was also to pay his part of plaintiff's advances to the partnership before he was to receive any cash.

The court then took the witness and asked him if it was not a fact that he was to get cash only after he had paid plaintiff not only the $2250 he owed him for his interest in the partnership but also defendant's part of what the partnership owed plaintiff for the latter's advances, and the witness stated that that was the agreement. He then admitted that he had stated in his deposition that there had been no understanding as to when he should get the $100 a month in cash, merely stating that when he made that statement in his deposition it was an error. Later defendant's deposition was sought to be introduced in evidence in which he stated that his impression was that he was to draw $100 a month *from this partnership* during the life of the partnership.'' He offered no explanation whatever for having made this statement in the deposition but objected to its introduction. We are unable to ascertain from the testimony of defendant at the trial what was the exact agreement.

Another thing that strikes us very forcibly in reference to defendant's testimony, is that he says that he was to receive $100 a month from plaintiff should he stay with plaintiff and as long as he should stay with him, or at least so long as the partnership lasted. This evidently means that plaintiff was to pay him $100 a month for work he was to do for plaintiff outside of defendant's duties to his employer, the cement company. This is undoubtedly what he means because he testified that he performed various services for plaintiff of this nature and he says that the agreement was that the $100 to be paid by plaintiff should continue regardless as to how much his salary was increased by the cement company. So it seems apparent that the $100 to be paid by plaintiff was not for any services to be performed for the cement company. We take it from defendant's testimony that he was performing various services for plaintiff outside of that connected with the cement company, and even other than his services to the partnership in which he himself was interested, for which he was getting no compensation from plaintiff. Plaintiff, according to defendant, in order to get defendant to stay was willing to pay him $100 a month extra out of plaintiff's own pocket so that he could

continue to have the benefit of defendant's services performed by the latter outside of those connected with the cement company.

The testimony of defendant's witness, Tyler, shows without any question that defendant was not supposed to take any salaried employment, if any employment whatever, other than that of the cement company, and an agreement that defendant was to work for plaintiff personally at a salary of $100 per month, which was comparatively a large salary as defendant was receiving only $250 per month from the cement company, when defendant was working for the cement company under an understanding that he was not to engage in the services of any other at a salary, was an agreement contrary to good morals and came near being a fraud upon his employer, the cement company, and was of doubtful legality.

However, defendant not having been able, even at the trial, to give a satisfactory account of what the agreement was between himself and plaintiff in reference to the payment of the $100 a month, we are forced to go to the evidence of plaintiff who, at the trial, gave at least a plausible account of what the agreement was, to-wit, that plaintiff was attempting to get defendant's salary increased by $100 a month and the latter was to receive that sum from plaintiff as a gratuity because plaintiff thought that defendant, who was his assistant, was entitled to a higher salary than he was receiving; that this sum was to be paid by plaintiff to defendant until such time as the cement company should increase the salary of defendant in an amount equal to that being paid him by plaintiff. Under the undisputed testimony defendant's salary was increased $100 a month four months after the agreement took effect, which would entitle defendant to a credit of $400 upon what he owed plaintiff for the purchase from plaintiff of a one-half interest in the partnership. We take plaintiff's testimony despite the fact that he gave somewhat contradictory testimony in his deposition and was contradicted by Eyer, although in a matter of no great materiality. This contradiction was in reference to plaintiff's testimony that defendant bought his first one-fourth interest in the partnership from Eyer instead of plaintiff, and Eyer seems to be corroborated by the partnership agreement. The only reason we accept plaintiff's version of the agreement is that we cannot arrive at the terms of the agreement from defendant's testimony and plaintiff's version seems reasonable.

Having come to this conclusion, it is unnecessary for us to pass upon the question as to whether the court erred in refusing to reopen the case in order to hear the testimony of Mr. Danielson, and likewise erred in refusing to sustain plaintiff's motion for a new trial on the ground of newly discovered evidence, such evidence being the same evidence upon which plaintiff sought to have the case reopened.

The judgment is reversed and the cause remanded with directions to the trial court to make the same allowance to plaintiff that was

made in the judgment appealed from, together with interest at six per cent per annum upon one-half of the advances made by plaintiff to the partnership to carry on its business, and to allow defendant the sum of $400 as a payment upon the amount he agreed to pay plaintiff for a one-half interest in the partnership. While the authorities are not uniform as to the right of a partner to interest upon advancements made by him to the partnership prior to the striking of a balance between the partners, the weight of the authority is to the effect that, in the absence of an agreement for interest, he is entitled to it in such a case, the rule being that a partner is not entitled to interest upon money advanced by him as contributions to the capital of the firm or additions to his capital in the absence of an agreement that interest is to be allowed, but if the money is advanced by a partner for the use of the firm, and is, in fact, a loan (and the evidence is undisputed in the case at bar that the advancements made by plaintiff were loans), then the partner is entitled to interest upon such advancements unless there is an understanding or usage or other circumstance tending to show the contrary. [30 Cyc. 444; Rowley, 2 Modern Law of Partnership, sec. 668; 20 R. C. L. 1021.] We do not deem Filbrun v. Ivers, 92 Mo. 388, in point.

*Arnold, J.,* concurs; *Trimble, P. J.,* absent.